Edward W. Schmitt, Esq. (SBN 101330)
Jeffrey M. McConnell, Esq. (SBN 126059)
John A. Mavros, Esq. (SBN 257673)
Edward.Schmitt@knchlaw.com
Jeff.Mcconnell@knchlaw.com
John.Mavros@knchlawcom
Koeller, Nebeker, Carlson & Haluck, LLP
3 Park Plaza, Suite 1500
Irvine, CA 92614-8558
949-864-3400; fax: 949-864-9000

Attorneys for Defendant
Pulte Home Corporation

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIELLE KINGSBURY, EMILIO SEGURA, PILIEN SEGURA et. al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. GREENFIBER, LLC a North Carolina business entity; PULTE HOME CORPORATION, a Michigan corporation; QUALITY INTERIORS, INC., a California Corporation, et. al., <br><br> Defendants. | Case No. CV08-151-AHM (JTLx) <br><br> Action filed: 11/15/2007 <br><br> **DECLARATION OF JEFFREY McCONNELL** <br><br> Date: July 6, 2009 <br> Time: 10:00 a.m. <br> Courtroom: No. 14 <br> 312 North Spring Street <br> Los Angeles, California |

I, Jeffrey McConnell, declare of my own personal knowledge as follows:

1.  I am an attorney at law licensed to practice before all the courts of the State of California and the Central District of the U.S. District Court and am a partner with Koeller, Nebeker, Carlson & Haluck LLP counsel of record for Defendant PULTE HOME CORPORATION ("PULTE").

2.  I have represented PULTE in all of the lawsuits that involve PULTE and Greenfiber cellulose insulation. I have prepared, attended and argued motions involving significant procedural issues surrounding the state court actions filed against PULTE. One such procedural issue concerned PULTE's motion to stay the *Matalas* purported class action case. In opposition to

1

1  the motion to stay, the Matalasas raised the issue of the Civil Code §931 and the sole defective

2  component exception to the Right to Repair Act. (RJN Exhibit B). On April 25, 2007, the San

3  Bernardino Superior Court granted PULTE's motion to stay the *Matalas* purported class action

4  due to the Matalas homeowner's failure to comply with the pre-litigation Builders Right to Repair

5  Process mandated by the Right to Repair Act (SB 800).   (RJN Certified Court Reporters

6  Transcript of Rhonda M. Borchard of Hearing of Pulte's Motion to Stay the *Matalas* action

7  before the Hon. Judge Kyle Brodie on the April 25, 2007, Exhibit C).

8      3.    The San Bernardino court also appointed a special master to address PULTE's right

9  to repair under SB 800.  The special master affirmed PULTE's statutory right to repair the

10  Matalas home. (RJN, Court Order Appointing Ross Hart Special Master, 9/21/2008 Special

11  Master recommendation, RJN Exhibit D.   Recommendation of the Special Master to the San

12  Bernardino Superior Court, RJN Exhibit E).

13      4.    In Support of PULTE's Opposition to the class certification motion the following

14  deposition testimony taken in the *Kingsbury* matter, is attached to my declaration.

15      5.    Attached as Exhibit "1" is a true and correct copy of portions of the deposition

16  transcript of plaintiff Emilio Segura, Vol. 1. taken on June 25, 2008 and Vol. 2 taken June 26,

17  2008. The time for correcting the deposition transcripts has expired.

18      6.    Attached as Exhibit "2" is a true and correct copy of portions of the

19  deposition transcript of Lauralee A. Naff (Estates homeowner and plaintiff in the *Kearl v. Pulte*

20  litigation) taken on August 15, 2008.   The time for correcting the deposition transcript has

21  expired.

22      7.    Attached as Exhibit "3" is a true and correct copy of portions of the deposition

23  transcript of Diane H. Matalas (Estates homeowner and plaintiff in the *Matalas v. Pulte litigation*)

24  taken on August 11, 2008. The time for correcting the deposition transcript has expired.

25      8.    Attached as Exhibit "4" is a true and correct copy of portions of the deposition

26  transcript of William J. Kearl (Estates homeowner taken on August 12, 2008.  The time for

27  correcting the deposition transcript has expired.

28      9.    Attached as Exhibit "5" is a true and correct copy of portions of the deposition

2

1    transcript of Konjit Mamo (Estates homeowner and plaintiff in the *Kearl v. Pulte* litigation) taken

2    on November 5, 2008.  The time for correcting the deposition transcript has expired.

3         10.   Attached as Exhibit "6" is a true and correct copy of portions of the deposition

4    transcript of Armando Villalobos, Jr., (Estates homeowner and plaintiff in the *Kearl v. Pulte*

5    litigation) taken on November 3, 2008.   The time for correcting the deposition transcript has

6    expired.

7         11.  Attached as Exhibit "7" is a true and correct copy of the Reporter's Transcript of Oral

8    Proceedings in *Kingsbury v. Greenfiber* regarding Plaintiffs' Motion for class certification

9    Monday, March 30, 2009

10        12. Attached as Exhibit "8" is a true and correct copy of the Minute (In Chambers) Orders

11    by Judge A. Howard Matz DENYING Motion for class certification without prejudice.

12        I declare under the penalty of perjury that the foregoing is true and correct.

13

14   Dated: May 29, 2009

15                                    JEFFREY M. MCCONNELL, ESQ.

16

17

18

19

20

21

22

23

24

25

26

27

28

137563_1.DOC

**DECLARATION OF JEFFREY McCONNELL**

# EXHIBIT "1"

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**CERTIFIED COPY**

DANIELLE KINGSBURY, EMILIO )
SEGURA, PILIEN SEGURA, )
individually and on behalf of )
all others similarly situated, )
)
)
            Plaintiffs, )
)
        vs. ) No. CV08-151-AHM (JTLx)
)
U.S. GREENFIBER, LLC, a )
North Carolina business entity )
PULTE HOME CORPORATION, a )
Michigan corporation; QUALITY )
INTERIORS, INC., a California )
corporation; and DOES 1 through )
1000, inclusive, )
)
            Defendants. )
_____ )

VIDEOTAPED DEPOSITION OF EMILIO SEGURA

VOLUME I

Wednesday, June 25, 2008

Los Angeles, California

Reported by:

LINDA A. BANKEY

CSR No. 7993



Certified Shorthand Reporters

15250 Ventura Boulevard
Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

recollection of?

    A   Mostly it was just initial and sign, initial and sign.

    Q   So that you could buy the house?

    A   Yes.

    Q   The -- on page 119 --

    A   119.

    Q   -- down about a quarter of the way down, it says, "Insulation," and it says, "Blown Cellulose."

    A   Yes.

    Q   At the time of the closing, did -- or before, did anyone explain to you what that meant?

    A   No, sir.

    Q   Did anybody talk to you about blown cellulose before you actually moved into the house?

    A   No, sir.

    Q   Do you -- so you had no idea what that meant at the time?

    A   No, I didn't, sir.

    Q   On the "Quality Features" at 116 --

    MR. PARKS:  I'm sorry.  You said page 116?

    MR. BURNSIDE:  I'm sorry.  I misspoke.

    Q   Page 161, the page titled "Quality Features?"

134

DECLARATION

I hereby declare I am the deponent in the within matter; that I have read the foregoing deposition and know the contents thereof, and I declare that the same is true of my knowledge except as to the matters which are therein stated upon my information or belief, and as to those matters, I believe it to be true.

I declare under the penalties of perjury of the State of California that the foregoing is true and correct.

Executed on the _____ day of _____ , 2008, at _____ , California.


_____
W i t n e s s

224

STATE OF CALIFORNIA    )
                       ) ss
COUNTY OF LOS ANGELES  )


    I, Linda A. Bankey, a Certified Shorthand Reporter, do hereby certify:

    That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

    That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

    I further certify that I am neither counsel for, nor related to, any party to said proceedings, nor in anywise interested in the outcome thereof.

    In witness whereof, I have hereunto subscribed my name.


Dated: **JUL 0 3 2008**

LINDA A. BANKEY
CSR No. 7993

**Word Index**

8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DANIELLE KINGSBURY, EMILIO SEGURA, PILIEN SEGURA, individually and on behalf of all others similarly situated, | ) ) ) ) ) | **CERTIFIED COPY** |
| Plaintiffs, | ) ) ) | |
| vs. | ) | No. CV08-151-AHM (JTLx) |
| U.S. GREENFIBER, LLC, a North Carolina business entity; PULTE HOME CORPORATION, a Michigan corporation; QUALITY INTERIORS, INC., a California corporation; and DOES 1 through 1000, inclusive, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

VIDEOTAPED DEPOSITION OF EMILIO SEGURA

VOLUME II

Thursday, June 26, 2008

Los Angeles, California

Reported by:

LINDA A. BANKEY

CSR No. 7993



Certified Shorthand Reporters

15250 Ventura Boulevard
Suite 410
Sherman Oaks, CA 91403

800-993-4464 • Fax 800-984-4464
www.uslegalsupport.com

Los Angeles • Orange County • San Diego • Inland Empire • Ventura • San Jose • San Francisco • Sacramento . . . and across the nation

```
 1          A    The amenities I thought was the appliances
 2     and stuff.
 3          Q    The features of the house?
 4          A    Yes, sir.
09:47 5      Q    And then the open spaces -- is that
 6     referring to inside the house?
 7          A    That was the backyard, sir.
 8          Q    The backyard.  Okay.
 9               The -- and then you liked -- you checked off
09:47 10    as ranking number 5 the floor plan layout, energy
11     efficiency, number of bedrooms and the size of the
12     house; right?
13          A    Yes, sir.
14          Q    And so principally you were looking to -- to
09:47 15    have more room for your very large family?
16          A    Yes, sir.
17          Q    And that was the principal motivating reason
18     that you moved over to the Pulte home?
19          A    Yes, sir.
09:47 20     Q    And it seemed like it would accommodate
21     those needs nicely?
22          A    Yes, sir.
23          Q    Here under -- you marked energy efficiency,
24     and -- and I assume that means you wanted lower
09:47 25    heating and cooling bills?
```

238

1      A    That was where the ice box, the washing

2   machine and dryer and the other electrical appliances

3   that they provided.

4      Q    They were more energy efficient?

09:48 5      A    Yes, sir.

6      Q    And you liked that?

7      A    Yes, sir.

8      Q    In terms of energy efficiency or heating,

9   cooling, that kind of thing, did anyone at Pulte ever

09:48 10   talk to you about the Cocoon Insulation?

11      A    No, sir.

12      Q    And during the course of talking with folks

13   at Pulte, did they ever show you or did you ever

14   receive what I'll mark as Exhibit 81?  It's titled

09:49 15   "Paint Maintenance, Frequently Asked Questions."

16         (Deposition Exhibit 81 was marked for

17         identification by the court reporter.)

18      MR. PARKS:  And, again, just noting for the

19   record the bottom right-hand corner, there's a date

09:49 20   of September, 2006.

21      MR. BURNSIDE:  Okay.  It says -- just so

22   that we're clear, it says, "Rev 09/2006."  I have no

23   idea what that means.

24      MR. PARKS:  I would assume that this means

09:49 25   this document in front of us was revised in

239

1    September, 2006.  So that's what it appears to mean

2    to me.

3              MR. BURNSIDE:  I think that's probably

4    right.

09:49 5         Q    Mr. Segura, have you ever seen this

6    document?

7         A    No, sir.

8         Q    The first question is the one I wanted to

9    ask you about.  It says, "Can mildew be permanently

09:49 10   avoided?"

11             Do you see that?

12        A    Yes, sir.

13        Q    And it says, "No.  Mildew can grow in any

14   area that is dark and moist with limited air

09:50 15   movement."

16             And do you agree with that statement of just

17   your general observations as a homeowner that mildew

18   can grow where it's moist and damp?

19             MR. PARKS:  Objection.  That completely

09:50 20   lacks foundation as phrased.  Incomplete

21   hypothetical.

22             THE WITNESS:  I'm not an expert, sir.  So I

23   don't know.

24   BY MR. BURNSIDE:

09:50 25        Q    No, based on your observations as a

240

1    homeowner?

2         MR. PARKS:  The same objection.  It lacks

3    foundation.

4    BY MR. BURNSIDE:

09:50 5    Q    You have seen mold and mildew in your -- in

6    your residence; right?

7         MR. PARKS:  Have you seen mold and mildew in

8    your residence?

9         THE WITNESS:  Yes.

09:50 10   BY MR. BURNSIDE:

11        Q    And generally it will appear where it's wet?

12        A    Yes.

13        Q    So you would agree with the statement that,

14   based on your observations, that mildew can grow

09:50 15   where it's wet?

16        A    I don't know how to answer it, sir.

17        Q    Okay.  Well, during the -- the process of

18   purchasing the home, did anyone ever tell you that

19   the home would be mold- or mildew-free?

09:51 20   A    No, sir.

21        Q    Did anyone ever tell you that the home would

22   resist mold?

23        A    No, sir.

24        Q    The -- I think I'm finished with the

09:51 25   questionnaire.

241

1          I think your -- correct me if I'm wrong.  It

2     seems that your principal contact with Pulte at the

3     beginning was Graig Lee?

4          A    Yes, sir.

09:51 5    Q    And then the next person that it seems like

6     you had the most contact with was Jeremy, who you

7     referred to as "Leroy"?

8          A    Yes.

9          Q    But we now know that's Jeremy?

09:51 10    A    Jeremy, yes, sir.

11         Q    Okay.  Did those gentlemen treat you nicely?

12         A    Yes, they did.  They were very nice and

13    kind.

14         Q    Do you feel like they were fair with you?

09:52 15        MR. PARKS:  Objection.  That calls for

16    speculation what their intent or motive was.

17    BY MR. BURNSIDE:

18         Q    Mr. Segura, I'm asking about how you felt at

19    the time.

09:52 20        Did you feel like they were being fair with

21    you?

22         MR. PARKS:  You can go ahead and answer.

23         THE WITNESS:  Go ahead and answer?

24         MR. PARKS:  Sure.

09:52 25        THE WITNESS:  I thought they were appeasing

242

Q    Just so that we're clear, we talked about wood flooring being installed in the suite of the house.

Is there wood flooring anywhere else in your home?

A    Yes, sir.

Q    And where else is it located?

A    It is located in bedroom number 3.

Q    Okay.  And was that wood flooring installed at the same time as the suite flooring?

A    Yes, sir.

Q    All right.  Any cracking that you have seen in your house, sir, on the concrete slab -- have you seen any signs of water or moisture coming through the cracks?

A    I never checked, sir.  I don't know.

Q    Okay.  That's all I can ask you to do.

In bedroom number 3, when the other wood floor was installed, did you happen to see the underside of the carpet pad when it was being replaced?

A    No, sir, I didn't.

Q    Okay.  You have other people that obviously live in the home with you, for example, your son-in-law Adrian; correct?

364

A    Oh -- oh, I don't remember if he was there or not.

Q    Ryan?

A    Ryan I didn't see too much.  No, I don't remember.

Q    Okay.  In terms of your customer service person, who was your primary contact?

A    It was a mixture.  First it was Jeremy. Then there was another guy.  I forgot what his name was.  And then there was another guy that took the other guy's place.  And then Erik was there for a while.  No, Erik was the last one.  Who was -- there were two guys before Erik.  It was like five or six different people.  So it was -- it was you try and -- you try to adjust to each person.

Q    Understood.

Did any of the customer service people that you have dealt with, sir, ever make any statements to you about the insulation?

A    I don't remember.

Q    Okay.  The same question.  Did any of the customer service people that you dealt with regarding your home make any statements to you regarding the drying time of the insulation?

A    I don't remember.

379

A    Yeah, you got me in trouble now.

Q    Yeah.  Well, all right.  You talked earlier today about some stucco cracking at your house.

A    Yes, sir.

Q    I just want to be -- I just want to be very clear and get your best recollection now.

You were talking about at the rear of the house?

A    Yes, sir.

Q    All right.  With regards to the front of the house, I think you said you had some cracking around the garage?

A    Some around the garage, and, you know, you have the normal house settling cracks -- that's what they called it -- house settling cracks along the windows and stuff, you know.

Q    In other words, where the corners are, you see a crack?

A    Yeah.  I mean, that's normal.  I mean, no big deal.

Q    Okay.  Have you over time done any kind of monitoring of the cracks to see if they're getting bigger?

A    No, sir, but that's a good idea, sir.

Q    For example, have you noticed if any

396

Q    -- because I know you're not a construction expert.

A    That's very true.

Q    All right.  All I'm asking is for your observations today.  Okay?

Have you yourself, sir, made any observations of any water or moisture penetrating any stucco cracking in your house?

A    I never looked for it.  I don't know, sir. No.

Q    Okay.  Has your son-in-law, for example, pointed out any cracking that he might think could lead to water intrusion inside the home?

A    I don't remember.

Q    Okay.  And you mentioned earlier today that there's been some attempts to try and repair some cracking, and you have different color stucco.

A    Yes, we do, sir.

Q    All right.  Is that throughout the entire home, or is it located pretty much along just one area of the house?

A    The big part of it is in the back -- back of the house, and there's a couple of small pieces up front where they tried to patch the garage.

Q    Okay.

398

Q    Okay.  I just want to be clear, though.

A    After the two-year warranty, that was it.

Q    Okay.  And you don't recall who told you that?

A    One -- there was two guys.  One was a little Mexican painter, and then the other one was another guy.  I can't remember who it was.  And he told me go ahead and paint it, and he painted it.  And then first it was like a brick yellow -- a light yellow dot spot, and then -- and then he went back to look for another color, and then he put the other color on, and it was totally different, and then he went back again.  And so -- but I don't know the person's name.  I'm sorry.  I don't know.

Q    Okay.  Have there been any other times where you have contacted Pulte to try -- to do a repair or to come out and look at your house after you called them and they told you about the two-year warranty?

A    The only time they told me that was when it was getting close.

Q    I'm sorry?

A    That was the only time.

Q    That's the only time?

A    Yeah.

Q    Have you ever observed any signs of moisture

400

on the windowsills at your house?

A    Moisture on the windowsills?  Could you explain the question --

Q    Sure.

A    -- I mean, reask the question?

Q    For example, if we've had a rain, have you noticed, for example, water sitting on the windowsill?

A    Inside?

Q    Yes, sir.

A    Outside, yes.  Not inside.  I never paid attention.  I don't know, sir.  I don't know.

Q    Okay.  Have you ever noticed around the window frame itself inside the house any signs of water staining?

A    I don't recollect.  I don't remember.  I don't know.

Q    Has any family member who's been to the home pointed out or mentioned to you seeing signs of moisture or leaks around the windows?

A    No.

Q    Okay.  Is there any problem with opening and closing windows?

A    Yes.

Q    What problems do you have?

A    The one in bedroom number 3, which is the

401

sir?

A    More than one cabinet.

Q    The brackets; correct?

A    Well, yes.

Q    Okay.  And when did that first begin?

A    Oh, shoot, that was like maybe three months after we moved in.

Q    Okay.  And was any attempt made to try and repair it?

A    Yes, they did, but it kept falling out.

Q    Okay.  Has there been more than one attempt to try and repair it?

A    I quit after the first time, sir.

Q    Okay.  As we sit here today, sir, in the master bathroom, have you observed any signs of plumbing leaks in that bathroom?

A    I never paid -- I really don't know, sir.

Q    For example, underneath the sinks in the vanity, have you noticed any signs of water staining?

A    I don't know.  I never looked, sir.

Q    Has the toilet ever leaked?

A    No, sir.

Q    Okay.  Has the shower or bathtub ever shown signs of leaking?

A    I don't remember.  I don't know, sir.

404

Q    Okay.

A    I never paid attention.

Q    You have got multiple bathrooms in this house.

A    Yes, sir.

Q    Let's talk about the bathroom right off the hallway here.

Have you noticed any plumbing leaks in the sinks in that bathroom?

A    I don't know, sir.  I never paid attention.

Q    Okay.  Has anybody ever complained of any leaking in that bathroom from the -- from the sinks?

A    No, sir.

Q    How about toilet leaks?  Any toilet leaks in that bathroom?

A    No toilet leaks.  No, sir.

Q    That bathroom has a tub.

Has anyone ever noticed or mentioned to you any leaking around the tub?

A    With the calking gone away on the first time, yes.  But after that, the calking is still kind of messed up, but no -- no big leaks, no.

Q    Okay.  And when did you first see a sign of leaking due to calking at the house in that bathroom?

A    When they came and calked the tub the first

405

time when they came in when we mentioned it.

Q   All right.  And since that time, there's been no further observations?

A   I never called them back out again.

Q   Has there been any other observations of leaking at that tub?

A   I never -- I never took another look.  I never took a look, I guess.

Q   Okay.  The bathroom off of bedroom number 4 -- any sign -- any complaints that you have noticed, sir, of leaking of the sinks in that -- in that bathroom?

A   No, sir.

Q   Any toilet leaks?

A   No, sir.

Q   That has a shower.

Any -- any complaints of leaking of the shower in that bathroom?

A   It was when they -- and they replaced the door.

Q   And when did that happen?

A   About a year and a half ago.

Q   Okay.  And since that repair was done, has there been any further leaking?

A   I really don't know, sir.

406

Q    Okay.  Has anyone, to your knowledge, in your house complained of further leaking at the shower in the bathroom number 4?

A    I really don't know.

Q    Okay.  Then we have the bathroom that's in the suite area.

A    Yes, sir.

Q    Any complaints of leaks of the sink in that bathroom?

A    I don't know, sir.

Q    Does the toilet leak?

A    I don't know, sir.

Q    That also has a shower.

     Any signs of leaking in that shower?

A    I don't know.

Q    Any family member ever complain of leaks?

A    I don't remember.  I don't know.

Q    Okay.  Have you made any observations of seeing moisture or wetness on any of the ceilings in your house?  Now, you mentioned one time yes, because we had the air-conditioning situation.

A    Yes, sir.

Q    After that situation, have there been any other circumstances where you have seen moisture or water on ceilings in your house?

407

A    I never checked.  So I don't know, sir.

Q    Okay.  For example, when there's been a
rain, has anyone in the household mentioned seeing
signs of water leaks coming from the roof?

A    No, sir.

Q    Okay.

A    The roof is good.

Q    Okay.

A    I hope so.

Q    Okay.  We've talked about the HVAC system,
and I think --

A    Yeah.

Q    -- you testified earlier that as of today
it's working all right.

A    It works, yes.

Q    Okay.  All right.  You mentioned earlier
today as well that there were some drywall issues in
the house, and you had some popped nails; correct?

A    I've still got them, sir.

Q    Okay.  Have you ever observed those nails --
the drywall nails themselves?

A    Yes, sir.

Q    Have you seen any signs of rust or corrosion
on those nails?

A    I don't know.  I never got down real close

408