1    John D. Klinedinst, Bar No. 86254
     Robert L. Clarkson, Bar No. 102183
2    Robert J. Hatem, Bar No. 185654
     Mark J. Goldsmith, Bar No. 244339
3    KLINEDINST PC
     777 S. Figueroa St., 47th Floor
4    Los Angeles, California 90017
     (213) 607-2115/FAX (213) 607-2116
5    mgoldsmith@klinedinstlaw.com

6    Stephen E. Embry, Pro Hac Vice
     Christopher S. Burnside, Pro Hac Vice
7    FROST BROWN TODD LLC
     400 W. Market Street, 32nd Floor
8    Louisville, KY 40202
     (502) 568-0253/FAX (502) 581-1087
9    sembry@fbtlaw.com
     cburnside@fbtlaw.com
10
     Attorneys for Defendant
11   U.S. GREENFIBER, LLC

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14

15   DANIELLE KINGSBURY, et al.,        Case No.   CV08-00151 AHM (JTLx)

16                                      **DEFENDANT'S MEMORANDUM OF**
                  Plaintiffs,           **POINTS AND AUTHORITIES IN**
17                                      **OPPOSITION TO PLAINTIFF'S**
                                        **MOTION FOR CLASS**
18        v.                            **CERTIFICATION**

19
     U.S. GREENFIBER, LLC, et al.,
20
                                        Date         July 6, 2009
21                Defendants.           Time:        10:00 a.m.
                                        Courtroom:   14
22                                      Judge:       A. Howard Matz
                                        Magistrate Judge: Jennifer T. Lum
23                                      Trial Date:  None set

24

25

26

27

28

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

## I.    <u>INTRODUCTION</u>

Plaintiff's Amended Class Action Complaint fails to identify a single specific statutory violation under California Civil Code section 895 *et seq*. (the California Right to Repair Act – "RORA").  Plaintiff's Amended Motion for Class Certification fails to show why this case can be certified under RORA. Plaintiff simply presents no evidence that alters the facts that Mr. Segura is not currently suffering from mold-related personal injuries; that there are many potential causes of mold and water decay in a residential home; and that any claimed defect or RORA violation is affected by conditions that vary substantially from home-to-home.

Plaintiff has intentionally overstated his case and ignores key provisions of RORA in a misguided attempt to circumvent the Court's March 30, 2009 Order (the "Order").  (For the convenience of the Court, a copy of the Order is attached as Exhibit X to Embry Decl. dated June 1, 2009 ("Embry Decl.")).  This case continues to be characterized by numerous unique and individualized issues relating to the discovery of mold in a limited number of homes which were built in Southern California during the heaviest rains of the century.  Nothing has changed: certification fails because Plaintiff's new claims are still supported only by the limited presence of mold and still "require the Court to individually examine the cause of any alleged mold …." (Order, p. 6).

## II.    <u>RELEVANT AND RESTATED BACKGROUND FACTS</u>

Many of the facts pertinent to class certification are set out in Greenfiber's original Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Class Certification, filed December 9, 2008 and found at Docket No. 81 ("Greenfiber Original Memorandum") and the Order.  Given Plaintiff's efforts to now apply RORA to the same evidence, some of these key facts bear repeating.[1]

///

---

[1] Greenfiber incorporates by reference the Greenfiber Original Memorandum.

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

## A.    The Insulation Product

Cellulose insulation has been used in attics and walls in residential structures for over 50 years and is regulated by various federal and state entities.  (Bowman Decl. dated December 5, 2008, attached as Exhibit T to Embry Decl.,"Bowman Decl., Em. Ex T" ¶¶ 8, 21).

Greenfiber sells Cocoon wet blown cellulose insulation ("CWBCI") to independent applicators who are sub-contractors of the builder.  (Order, p. 1)  As delivered, CWBCI is compacted in bags and dry.  (Bowman Decl., ¶ 5, Em. Ex. T)  At the job site, the applicator fluffs and adds water to CWBCI to activate the adhesive that stabilizes the insulation mass and changes the physical qualities of the product.  (*Id.* at ¶¶ 5, 6) (Plaintiff's Amended Complaint, attached as Exhibit A to Michael Parks Decl. dated May 18, 2009, ("Parks Decl."), and found at Docket No. 117, "Amended Complaint", ¶ 20).  Greenfiber recommends an installed moisture level between 25-35% and that CWBCI not be covered until the moisture level reaches 25%.  (Bowman Decl., ¶¶ 6,7,11, Em. Ex. T)  Greenfiber personnel are rarely present during the application process; the equipment necessary for installation is owned and operated by the applicator.  (*Id.* ¶ 12).[2]

## B.    Building Science

During construction and the life of a structure, water and water vapor will present challenges.  (Williams Decl. December 5, 2008, attached as Exhibit U to Embry Decl, "Williams Decl. Em. Ex. U," Pt. B, ¶ 5).   Most, if not all, construction materials (including such things as concrete, paint, wood framing and dry wall) have some level of moisture content when first installed.  (*Id.* at  ¶ 7)  If any of these products are not allowed to dry properly, moisture and mold problems can and do arise.  (*Id.*)  Structures typically contain a variety of hygroscopic materials; whether and the extent to which these materials absorb moisture is

---

[2] In fact, the flow rates of the product, water and product flow settings, the number and size of moisture tips on the equipment, the ratio of the product to moisture, the type of equipment used and the ratio of recycled product are controlled by the applicator and can affect the installed moisture content.  (Bowman Decl.,  ¶¶ 12, 14, Em. Ex. T)

1   highly variable and depends on multiple factors.  (Salazar Decl. dated December 5,

2   2008, attached as Exhibit S to Embry Decl,"Salazar Decl. Em. Ex. S,"  ¶¶ 8, 9).

3       During the life of a structure, moisture may enter the wall cavity.  (Williams

4   Decl., ¶¶ 9-10, Em. Ex. U)   In those instances, the dwelling should be designed to

5   promote drainage of the water out of the cavity.  (*Id.*)  It is also expected that water

6   vapor will properly dry or diffuse through existing wall components (like drywall)

7   as the vapor migrates to drier, cooler air.  (*Id.* ¶ 10)  None of these characteristics

8   are unusual or evidence any sort of construction deficiency.

9       Factors that can affect the accumulation, migration and re-distribution of

10  moisture in a wall, and whether and to what extent it can cause problems include:

11  the source of the water, how it gets into a dwelling, in what quantity, and how long

12  it remains; the construction process and requirements; the building design;

13  installation of products; occupant life style issues; and other environmental

14  conditions.  (*Id.* Pt. C, ¶ 2; Williams Decl., Ex A, pp. 4-7, Em. Ex. U)  These

15  factors are all critical in determining the source of water, drying conditions and

16  why moisture related problems may occur.  (Williams Decl., Pt. B, ¶ 12, Em. Ex.

17  U).

18      The various differences among structures and their case histories which are

19  pertinent to this case include:  (1) the 100-year storm in Southern California; (2)

20  dripping wet drywall; (3) dripping wet insulation; (4) pooling water on concrete;

21  (5) wet wood; (6) green wood; (7) improper insulation of CWBCI; (8) a rapid

22  construction process; (9) not allowing structures to "dry out;" (10) moisture

23  content of concrete; (11) use of semi-gloss latex paint; (12) drilling through

24  cultured marble for post-construction grab bars in showers; (13) post-construction

25  HVAC leaks and flooding; (14) post-construction window leaks; (15) occupant life

26  style choices; (16) climate zone; (17) dwelling geographical orientation;

27  ///

28  ///

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
2:08-CV-00151-AHM-JTL**

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1    (18) environmental conditions; and (19) multiple applicators using differing Pulte

2    "Scope of Work" requirements for the spray applied insulation.  (*See* Williams

3    Decl., *generally*; Em. Ex. U; Order, p. 6).

4        These factors will have a direct and indirect impact on wall performance,

5    water movement within a home and the potential for mold growth in a particular

6    area in a particular house.  (Williams Decl., Ex. A, ¶ 4, Em. Ex. U)  The direct

7    impact is obvious: water can contribute to mold growth.  The indirect impact

8    relates to the volume of water; the moisture content of products, and how these

9    issues increase relative humidity inside and outside a dwelling.  Increased humidity

10   will dramatically affect drying times.  Multiple factors can affect the potential for

11   the accumulation of moisture and its moisture re-distribution within a structure.

12   (Williams Decl., Ex. A, ¶ 7, Em. Ex. U)  Mold development and determining the

13   cause of particular mold or water issues in a dwelling requires a house-by-house

14   investigation.  (*See* Williams and Salazar Decls., *generally,* Em. Exs. U, S; Order,

15   pp. 6, 8).

16       **C.    The Dwellings**

17       Six different applicators installed CWBCI in the six Pulte subdivisions

18   where mold, the only evidence offered by Plaintiff of product defect or, for that

19   matter, RORA violation, was discovered. (Order, p. 6; Oberg Rpt. p. 12, Em. Ex.

20   L)  Each of these applicators utilized their own crews and equipment, and had

21   separately negotiated Scope of Work requirements with Pulte, some of which

22   varied in fundamental ways that would affect installed moisture content, drying

23   times and overall performance of CWBCI.  (Williams Decl., Ex. L, Em. Ex. U)

24   The installation practices and techniques varied between and even within

25   companies.  (Oberg Rpt. pp. 14, 16-17, Em. Ex. L)

26       In 2005, Pulte discovered the presence of mold behind marble shower

27   surrounds and kitchen cabinets in some houses and implemented a procedure to

28   identify damage. (Oberg Supp. Rpt. p. 2, Em. Ex. L)  The result of this process

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1   varied considerably: some houses had mold predominantly in the kitchens, while

2   others had mold predominantly in bathrooms; some dwellings had no mold, and

3   some even had mold where there was no CWBCI.  (Oberg Rpt. pp. 11-12, Em. Ex.

4   L; Segura Depo. at 290-93, Em. Ex. H; Order, p. 8)   Pulte remediated and repaired

5   virtually <u>all</u> of the houses with mold.  (Oberg Rpt. pp. 11-12; 18-20, Em. Ex. L)

6   ### D.    Related Litigation

7         Ignoring differences among the houses and that the houses were repaired to

8   the satisfaction of most owners, Plaintiff's lawyers filed two putative class actions

9   and an individual lawsuit on behalf of Segura and other individuals who were

10  original parties to this Action.  In October 2006, Diane Matalas instituted the first

11  class litigation in state court against Pulte and Quality Interiors, Inc. (QI)[3].

12  (*Matalas* Complaint, Em. Ex. B)  The *Matalas* action was stayed pursuant to

13  RORA section 910 et. seq.

14        The Plaintiff's lawyers next filed this action against Pulte, QI and Greenfiber

15  based originally on claims of negligence, product liability and violation of

16  California's Business Profession Code section 17200 *et seq*. (hereinafter "UCL")[4]

17  In May 2008, Plaintiff and his lawyers filed yet another lawsuit, again against Pulte

18  on behalf of Segura and others which has now also been stayed.  (*Kearl* Complaint,

19  Em. Ex. A)  This action — like the *Matalas* action — is also "really about"

20  CWBCI.  (*Id.* ¶ 9)[5]  The homes were allegedly defectively constructed due to

21  presence of "insulation defects including wall cavities and attics." *See* letter of

22  Schimmel & Parks on behalf of Segura (Em. Ex. N) demanding and instituting the

23  pre-litigation procedures of RORA section 910 for repair of "wall cavity moisture

24  and resulting damage, including defective installation of … insulation … [and]

25  mold and fungus … from the insulation" and other construction defects.

26

---

[3] Segura, the sole remaining named Plaintiff here, is also a member of the putative *Matalas* class.

[4] Despite concerted efforts by Plaintiff's lawyers to solicit participation in the present and related lawsuits, only seven homeowners have actually joined in any of the litigation: Kearl, Kingsbury, Naff, Villalobos, Segura and Linn . (See Schimmel & Parks postcard, Em. Ex. Q)

[5] As noted by this Court, the *Matalas* case is "really about" CWBCI.  (See Order dated March 17, 2008, Em. Ex. O).

27

28

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
2:08-CV-00151-AHM-JTL**

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

### E.    The Property Owners

The individualized construction, water intrusion and case history differences presented by the testifying and litigating homeowners in this case – much less among all the proposed class members – are striking.  These differences will directly impact the outcome of each owner's claim. (Williams Decl. Pt. C, ¶¶. 4-7, Em. Ex.U)

#### 1.    Emilio Segura

On Mr. Segura's first visit to the construction site, he observed that only a portion of his roof was up allowing heavy rains to readily inundate uncovered construction materials.  (Segura Depo. at 147-148, Em. Ex. H)   Segura testified "this whole place was flooded through here.  It was full of water." (*Id.* at 152)  When he touched the exposed insulation in the walls of one of the bathrooms, he discovered it was "dripping wet." (*Id*. at 155-156)  In the master bath (where mold was found), Segura saw water ponding around the vanity and the bathtub.  (*Id*. at 179-181)  The daily construction log kept for the Segura house indicates "$H_2O$ on slab for three weeks during construction." (*Id*. at 329)  The "Segura flooding" is documented by photographs taken by Segura.  (*See* Williams Decl., Ex. C, Em. Ex. U)

After construction, water issues persisted.  A May 2005 "service history request" illustrates a range of problems, including an HVAC leak which damaged the master bathroom. (Segura Depo. at 311-12, Em. Ex. H)  The HVAC leak was "coming down like Niagara Falls" (*Id*. at 203, 312) and "flooding down the central hallway." (*Id.* at 325)  Pulte subsequently discovered mold in the same rooms Segura previously photographed with the "standing water," "flooding" and/or "Niagara Falls" leak.  (*Id*. at 216-17)  Mold also was detected in the Segura house in places without CWBCI.  (*Id.* at 220-21).

///

///

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

### 2. William Kearl

William Kearl's house was built during "the floods." (Kearl Depo. at 38, Em. Ex. D) Kearl visited the house during the pre-drywall phase of construction and noted that the structure, including the wood framing, was extremely wet. (Williams Decl., ¶¶ 8-10, Ex. D, Em. Ex. U) Kearl asked Pulte to let his house "dry out for a month" but "they closed it up anyway b/c of their production schedule." (*Id.*) After construction, Kearl had numerous roof leaks and discovered a large opening in his roof. (Kearl Depo. at 67, Em. Ex. D)

### 3. Diane Matalas

Gaps around the doors and loose windows in the Matalas' dwelling allowed moisture to enter the home and cause mold. (Matalas Depo. at 169-170, Em. Ex. F; *Matalas* Complaint ¶24, Em. Ex. B) Water also entered the windows in the master bath "above the tub" – the same tub with the marble surround behind which Pulte found mold. (Matalas Depo. at 250-51, Em. Ex. F) After construction, holes were drilled through the marble surround in several places in the master bathroom shower to install "grab bars." (*Id.* at 25) The Matalas complained that their house (and, presumably, the houses of others in the putative class) was "afflicted" with construction defects, including, "defective doors, windows, moisture barriers, roofs, flashing, framing, and foundation systems and slabs, which all cause water to pass through and into the home causing substantial mold problems." (*Matalas* Complaint ¶ 24, Em. Ex. B)

### 4. Other *Kearl* Plaintiffs

The other *Kearl* plaintiff's dwellings also evidenced an array of significant and different water and construction issues. In the Villalobos' house, for example, ceilings were bowed, the foundation was cracked, and the outside stucco had excessive cracking. (Villalobos Depo. at 87-91, Em. Ex. I) Villalobos also had "gaps between the shower and the wall" in his center bathroom. (*Id.* at 159) After the remediation, Pulte informed him that his mold was due to the use of "green

- 7 -

1    wood and the wet season… the wood wasn't treated correctly." (*Id*. at 107-08)

2        Konjit Mamo visited her house multiple times during construction during the

3    rains. (Mamo Depo. at 64-6, Em. Ex. E)  When going to the house the Mamo

4    family noted, "Be careful not to slip." (*Id*. at 66-67)  Pulte later informed her that

5    the mold in her house had been caused by construction during the rainy season and

6    that the insulation in her home may have gotten wet during construction. (*Id*. at

7    77-81)  The Mamo house experienced extensive cracks throughout the exterior and

8    interior walls. (*Id*. at 135)

9        The conditions reported by just these homeowners create "a myriad of

10    different issues" that must be individually analyzed whether the claims are those

11    originally set out by Plaintiff or are the RORA claims now being advanced. (*See*

12    Williams Decl. *generally*, Em. Ex. U; Order, p. 10)

13    **III.    ARGUMENT**

14        Plaintiff's fundamental certification problem remains: among other things,

15    he lacks both commonality and typicality.  The only evidence of any common

16    defect or of any specific RORA violation remains the mold, which can result from

17    a variety of individual causes. (Order, p. 7)  Plaintiff confuses what is arguably

18    recoverable under the RORA with what he must show to achieve certification.

19        **A.    RORA is a Repair Statute**

20            **1.    Legislative Purpose**

21        As its name implies, the RORA is fundamentally a repair statute that

22    provides homebuilders with the right and option to repair homes, based on an

23    enumerated set of housing performance standards, <u>without</u> forcing either

24    homebuilders or homeowners into expensive litigation to achieve that end. (*See*

25    Greenfiber Original Memorandum, p. 21.)  RORA further provides an obligation

26    for homeowners to provide notice to homebuilders of any violations so that the

27    homes can be repaired before litigation commences. See RORA section 910 et.

28    seq. The enactment of RORA represented "groundbreaking reform" in the area of

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

construction defect litigation through the purposes and goals of: (1) "defin[ing] construction defects to ensure performance with specified standards" and (2) giv[ing] builders an absolute right to repair alleged defects."  (Hearing on Construction Defects Liability and Procedure, Assembly Committee on Judiciary, August 26, 2002, Em. Ex. Y, "Em. Ex. Y"; Hearing on Construction Defects, Senate Judiciary Committee, August 29, 2002, Em. Ex. Z, "Em. Ex. Z"**;** *see* Carpenter Decl., attached as Ex. W to Embry Decl., "Carpenter Decl., Em. Ex. W", generally)  "The costs associated with construction defect litigation" was a principal concern of the legislature and a driving force to create a non-litigious procedure to resolve construction disputes.  *Greystone Homes, Inc. v. Midtec*, Inc., 168 Cal. App. 4th 1194, 1227 (2008)  Both the California Senate and Assembly noted that problems associated with excessive construction defect litigation had "vexed the Legislature for a number of years" and that the enactment of RORA was necessary to address the "costs associated with construction defect litigation." (Em. Exs. Y, Z).

The statutory provisions of the RORA are divided into three categories: (1) provisions that obligate homeowners to provide notice of alleged construction defects to builders; (2) provisions that provide builders with an absolute right to repair such defects within specified timeframes and in cooperation with the homeowner; and (3) provisions that define terms and enumerate the finite list of recognized housing performance standards.  In addition, the RORA creates the ability to recover limited damages for violations and a failure to repair or remedy the actual breach of the home's performance in specific and enumerated ways.[6] Significantly, the RORA provides specific affirmative and common law defenses to potential defendants in the event that, after exhausting the pre-litigation obligations, a claim is actually filed with a court.

---

[6] Plaintiff seeks to confuse the issue by suggesting that RORA changes the substantive law of negligence and product liability.  RORA creates its own cause of action governed completely by its own terms.  To be liable under the Act, a Defendant must violate the specific provisions of the Act. RORA section 942.

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1    Not surprisingly, given that the undisputed intent of the RORA was to

2    provide a superior, non-judicial procedure to get damaged homes fixed, since the

3    RORA's passage in 2003, the number of "construction defect" cases in California

4    courts has dropped substantially. (Carpenter Decl., ¶ 12, Em.Ex. W)

5    **2.    RORA does not create absolute liability or absolutely**

6    **eliminate the economic loss rule for claimed product**

7    **defects.**

8    To make a RORA claim, there must be a showing that the specific

9    performance standards of section 896 have actually been violated or that, pursuant

10   to section 897, damage was actually caused by the component in issue. (*See* RORA

11   section 942)

12   RORA section 942 provides that no further showing of causation on damages is

13   required if and only if the homeowner demonstrates "in accordance with the

14   applicable evidentiary standard" a violation of one of the section 896 standards,

15   subject to specific defenses enumerated in section 945.5.

16   The section 945.5 defenses incorporate various causation and damage

17   concepts, many of which are directly at issue in this case.  A defendant is not

18   responsible:

19   • For damages caused by an unforeseen act of nature (  945.5a);

20   • For damages caused by the homeowner's failure to allow access for

21       repair or provide notice (section 945.5b);

22   • For damages caused by the failure of the sub-contractors to follow

23       manufacturers' recommendations (section 945.5c);

24   • For damages caused by alterations and misuse (section 945.5d); and

25   • To the extent that any repair has corrected the violation (section

26       945.5g).

27   These (and other) alternative potential causes will be directly at issue in the claims

28   of the proposed class representative and, depending on the circumstances, may be

- 10 -

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1    at issue in every situation involving CWBCI.  (Greenfiber Original Memorandum,

2    pp. 3-9; Order, p. 6, 10)  More fundamentally, however, Plaintiff has not and

3    cannot establish violations of an applicable standard or that such violation is

4    common and typical of the putative class.  (*See* Part IIIB hereof).

5        RORA section 936 applies RORA to entities other than builders to the extent

6    that a violation is caused by their negligent act or omission.  (*See Greystone,* 168

7    Cal. App. 4th at 1216-17)  RORA section 936 also provides to non-builder entities,

8    in addition to the section 945.5 defenses, "all common law…defenses applicable to

9    any claimed violation …" and recognizes the applicability of joint and several

10   liability of those who contribute to any violation.[7]  Thus, far from creating absolute

11   liability for a product defect claim as Plaintiff asserts, RORA requires a threshold

12   showing of a violation of its standards and provides numerous causation related

13   and other defenses which create the "myriad of different issues" with which this

14   Court is concerned.  (Order, p.10).

15       Plaintiff relies heavily on *Greystone* (which was neither a strict liability nor

16   a class action decision) for the erroneous proposition that RORA abrogates the

17   economic loss rule for <u>any</u> claim, changes the jurisprudence of negligence and

18   product liability and creates what can only be described as an absolute liability on

19   the part of a product maker.  The relevant holding in *Greystone* is simply that a

20   builder who effectuates repairs for enumerated performance violations of RORA

21   may recover from a product maker the cost of the necessary repairs for section 896

22   violations – even if the repairs for a violation include costs that had previously

23   been categorized as strictly "economic loss."  *Greystone,* 168 Cal. App. 4th at

---

[7] Plaintiff erroneously implies that the last sentence of section 936 (which provides "that the negligence standard in this section does not apply to claims for which strict liability would apply.") creates some type of undefined, absolute liability for entities such as product makers irrespective of cause and damage. See Plaintiff's Memorandum of Points and Authorities in Support of Motion for Class Certification, dated May18, 2009 and filed at Docket No. 127, "Plaintiffs Amended Memorandum", p. 8.  If true, then the section 936 negligence standard would have virtually no meaning for non-builders.  Instead, the last sentence of section 936 can only be read as to recognize that section 936 negligence concepts do not apply to general product claims that might be brought under section 897. It is fundamental that while a product maker may be held strictly liable for their product, there must be some sort of evidence of defect and the defect has to cause some damage. *See Greystone,* 168 Cal. App. 4th at 1216, fn 14.

1 1217-18.[8]

2      In direct contradiction to Plaintiff's current argument, *Greystone* explicitly

3 recognizes that sections 896 and 936 together in fact establish negligence and

4 causation standards for product makers. *Greystone,* 168 Cal. App. 4th at 1216-17

5 and fn.14. Although "economic loss" damages may ultimately be recovered from

6 a product maker for violation of some but not all of the   896 standards – a

7 homeowner <u>must</u> meet his burden of proof with regard to the negligence standard

8 in order to sustain a cause of action against such a maker. ("We conclude that the

9 Right to Repair Act abrogates the economic loss rule in actions brought by

10 homeowners against individual product manufacturers for a violation of the Act's

11 standards based on the manufacturer's negligence…" *Id*. at 1217.)

12      Far from confirming "that RORA eliminates the individual issues and

13 burdens cited by the Court in its March 30th Order regarding causation or actual

14 resulting mold and moisture damage from the class of Pulte homeowners," as

15 Plaintiffs allege (Plaintiff's Amended Memorandum, p. 7), *Greystone* actually

16 recognizes that individual concepts of violation, causation and damage are still

17 very much at issue under the RORA.

18      **B.    Plaintiff Has Not Properly Established Any RORA Violation**

19      As a threshold matter, Plaintiff must establish a common and typical

20 violation of a specific RORA standard. RORA section 896 sets forth certain

21 specific performance standards for residential housing. These standards are

22 specific and detailed and all require the occurrence of a certain event, such as the

23 passing of unintended water. The standards do not include a general product

24 defect or failure standard; rather section 896 looks toward the performance of each

25 structure.

26 ///

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

---

[8] Plaintiff argues that the RORA fundamentally changes the jurisprudence of negligence and product liability in a construction defect case. RORA sections 896, 897, 942, and 936 establish that the RORA does not eliminate causation and damage concepts.

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
2:08-CV-00151-AHM-JTL**

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1    The only RORA standard that might embrace a more general product defect

2 or failure is the "catch-all" provision:  "To the extent that a function or component

3 of a structure is <u>not addressed</u> by these standards, it <u>shall be actionable if it causes</u>

4 <u>damage."</u>  section 897 (emphasis added). section 897's requirement of a causal

5 relationship raises all the certification issues and concerns previously recognized

6 by this Court.  (*See* Order, pp. 6, 7, 10) [9]  The economic loss rule applies to claims

7 under section 897.

8    Plaintiff must establish a common violation of the specific section 896

9 standards. There is no such evidence; in fact, an analysis of these standards reveals

10 numerous individual issues.  Each of Plaintiff's alleged violations are considered

11 separately below.[10]

12    **1.    Section 896(a)(10)**

13    RORA section 896(a)(10) requires that the exterior wall of a home to have

14 been installed so as (1) not to allow "unintended" water (2) to pass into a structure

15 and/or (3) beyond, around, or through moisture barriers.  Thus, the mere presence

16 of moisture in a wall <u>does not</u> constitute a violation unless the moisture is

17 unintended and actually goes some place.  Plaintiff has failed to present any

18 evidence that, on a class wide basis, CWBCI has allowed unintended water to pass

19 into a structure or by-pass a moisture barrier.

20    Ignoring for the moment that Plaintiff's claim appears to be that CWBCI

21 impedes moisture movement (s*ee* Amended Complaint, ¶ 20), on its face, section

22 896(a)(10) raises significant individual issues: Was the water in any given structure

23

24 [9] Recognizing this fundamental flaw, Plaintiff makes much of an alleged admission by Pulte that the CWBI is defective. Plaintiff's Amended Memorandum, p.15.  But as set out in the Greenfiber Original Memorandum, the so called admission, if it is one, can only be an admission as to Pulte, not Greenfiber. *Id.*, p 9, FN 6.  More importantly, however, Plaintiff's Amended Complaint and Certification Motion are based upon the alleged violation of the RORA standards. Amended Complaint,  ¶ 1.  Pulte's alleged admission is not that Greenfiber violated RORA or its performance standards. Parks Decl. dated May18, 2009, found at Docket Nos. 132-134,  "Parks Decl.", Ex. B, ¶¶ 78, 86.

25

26

27 [10]  The applicable law with respect to the requisite commonality and predominance showings is fully set out in the Greenfiber Original Memorandum and summarized in the Order.  Greenfiber Original Memorandum pp. 12-15, Order, p. 5, 10. Plaintiff has utterly failed to establish either sufficient typically, commonality or predominance under these standards in the Amended filings.  *Valentino v. Carter-Wallace, Inc.* 97 F.3d 1227, 1233 (9th Cir. 1996).

28

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
2:08-CV-00151-AHM-JTL**

1   unintended or was it intended?  Was the water introduced by a sub-contractor

2   installing CWBCI in a given structure in contravention of its instructions, making

3   it "unintended?"  Did the unintended moisture go someplace or was it, as the

4   Plaintiff alleges here (*Id.*), retained by the CWBCI?  Did the installation of

5   CWBCI allow the unintended water to migrate in a given residence or was the

6   migration the result of the myriad of other factors cited by the experts?

7        In fact, Plaintiff makes no effort (and provides no evidence) to explain how

8   the installation of CWBCI allows unintended water to "pass beyond, around or

9   through moisture barriers" or that Greenfiber was responsible for the wall

10  installation.  Even if he had, Plaintiff has no evidence that the moisture barriers (if

11  any) in each of the proposed class members' homes shared a common location,

12  quality, purpose, etc.  Simply put, the issues of whether moisture entered a wall,

13  where the moisture went, and the existence, type, and location of moisture barriers

14  will require an individualized house-by-house determination; there is no evidence

15  of commonality.  (*See* Williams Decl., Parts A-C, Em. Ex. U).

16              **2.    Section 896(a)(11)**

17       RORA section 896(a)(11) provides that the exterior walls shall not allow

18  excessive condensation to enter the home and cause damage to another component.

19  Again, the only evidence of possible damage to any other component is the

20  presence of mold which could result from a variety of causal agents.  (*See* Order, p.

21  6)  In addition, Plaintiff essentially argues that CWBCI itself introduces water (not

22  condensation) to the wall cavities through the moisture that is utilized during

23  installation.  Amended Complaint, ¶¶ 19-22.  Plaintiff makes no argument that

24  some inherent property of CWBCI actually allows condensation to enter the home.

25       Greenfiber has presented substantial evidence that the moisture levels in any

26  particular home and any damage caused thereby will be impacted by a large range

27  of individualized factors.  (*See* Greenfiber Original Memorandum, Part IIB;

28  Williams Decl., *generally,* Em. Ex. U).  Greenfiber has presented substantial

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1   evidence relating to the range of factors that affect moisture and condensation in a

2   home – issues relating to construction materials, construction techniques,

3   homeowner practices, weather, and building orientation will require an

4   individualized house-by-house determination. *Id.*

### 3.    Section 896(g)(3)

6   RORA section 896(g)(3), which provides that a manufactured product shall

7   not be installed so as to interfere with the product's useful life, is inapplicable.

8   There is no allegation or evidence that the alleged defect of CWBCI (which

9   according to the Plaintiff, its propensity to retain or "lock in" moisture, as opposed

10  to fiberglass which presumably allows moisture to pass through the wall), affects

11  the utility of CWBCI itself.  (*See* Plaintiff's Memorandum of Points and

12  Authorities, in Support of Motion for Class Certification, filed November 15, 2008,

13  found at Docket No. 64, hereinafter "Plaintiff's Original Memorandum" p. 20)

14  Rather, Plaintiff claims that CWBCI causes or promotes other problems, such as

15  mold. Amended Complaint ¶¶19, 21, 22.   Similarly, Plaintiff's Motion makes no

16  attempt to establish that the alleged interference with the utility of the insulation is

17  typical or common among all class members.

18  As with the other RORA standards, a determination of whether CWBCI was

19  installed in such a manner that would "interfere with its useful life" will require an

20  individualized determination based on which contractor performed the installation,

21  what the contractor's particular practices were, and what the individual contract

22  provisions required, among other things.  Finally, section 896(g)(3)(C) explicitly

23  defines "manufactured product" for purposes of this particular section as "a

24  product completely manufactured offsite." As Plaintiff admits, CWBCI is

25  manufactured in dry form, and then shipped to construction sites where water is

26  added for installation. (*See* Amended Complaint, ¶¶17, 20)[11]  Thus, CWBCI is not

27

28  ---
[11] Interestingly and perhaps not surprisingly, the Plaintiff cannot commit as to how he wants to treat CWBCI. Plaintiff has alleged that CWBCI is altered at the site (See Amended Complaint, ¶¶ 17, 20, "the physical qualities of

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

- 15 -

a "manufactured product" and section 896(g)(3) does not apply.[12]

### 4.    Section 896(g)(15)

Section 896(g)(15) provides that "Structures shall be constructed in such a manner so as not to impair the occupants' safety because they contain public health hazards <u>as determined by a duly authorized public health official, health agency, or governmental entity having jurisdiction</u> (emphasis added)." This section specifically requires an official determination of public health hazard by health officials, and a showing of actual impairment to the safety of a particular structure's occupants. There is no allegation or evidence of either.

### C.    <u>The Claimed Violations and Greenfiber's RORA Defenses Present Numerous Individual Issues</u>

As this Court previously analyzed, the myriad of individual facts that will be at issue for the named Plaintiff and each unnamed plaintiff class member establish a lack of commonality, typicality and predominance.  These facts do not change with Plaintiff's attempt to presently use RORA.  The undisputed facts of this case demonstrate that the RORA claims and Greenfiber's defenses will be unique with respect to Segura and each and every homeowner.

For example, for Segura, the following issues will need to be addressed: Did interior flooding cause the alleged mold and moisture issues in his house?   Did the HVAC leak cause the alleged issues?  Did a failure to cover the roof?  Did missing drywall?  These individual defenses, particularly the impact of the unforeseen act of nature (torrential rains) threaten to become the central focus of the litigation.  Plaintiff's amended filings do nothing to change the previous result: Segura's claims are neither common nor typical of the class.

777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017
KLINEDINST PC

---

Cocoon insulation change when interacting with water and moisture"). However, when it comes to pleading product liability, Plaintiff says that CWBCI reaches "Plaintiff customers as manufactured and without substantial change in condition" (See Amended Complaint, ¶ 65).

[12] By asserting that CWBCI is a "manufactured product" under section 896 (g)(3), Plaintiff may have admitted himself out of any RORA claim against Greenfiber:  "This title does not apply to any action seeking recovery solely for a defect in a manufactured product …."  section 896 (g)(3)(E).

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1    Moreover, the individual case history of each proposed class member's

2    house varies on the key issue of moisture intrusion and mold causation that is

3    crucial to Plaintiff's alleged RORA claims.  As this Court recognized, Defendants

4    have presented significant and persuasive evidence that the impact of the alleged

5    CWBCI defect on the members of the proposed class is affected by conditions that

6    vary substantially from house-to-house.  (Order p. 6)  The myriad of variables,

7    which are confirmed by every witness in the case include: individualized inquiries

8    into whether mold or moisture issues occurred and, if so, where they were located

9    and what were the causes; county to county individualized inquiries into climate;

10   individualized inquiries into housing design and construction workmanship; and

11   individualized inquiries into the practices of numerous insulation applicators, each

12   with different contractual requirements.  Plaintiff's alleged commonality is

13   completely dependent on the uncommon issues of fact and law.

14        Plaintiff cannot satisfy the typicality element based on an allegation of a

15   common section 896 or section 897 violation alone.[13]  The undisputed evidence

16   clearly demonstrates the extent to which the facts underlying Segura's claim are

17   not typical of the proposed class members.  The contrast between his situation and

18   what is alleged with respect to a significant portion of unnamed class members

19   illustrate his atypicality in ways that affect central RORA issues.  For example,

20   Segura's house manifested mold, while more than 90% of the absent class

21   member's houses have not; Segura's home was remediated, while homes of others

22   in the class may not have been.  Segura also apparently has concerns about his

23   health, others in the class may not. Segura has claimed to have suffered non-

24

25   _____
     [13] The law pertaining to typicality is set out in the Greenfiber Original Memorandum and the Order.  See Greenfiber
     Original Memorandum, p. 13, Order, p. 7-8. The typicality inquiry compares the proposed representative to the class
26   and "is intended to assess whether the action can be efficiently maintained as a class and whether the [proposed
     representatives] have incentives that align with those of absent class members so that the absentees' interest will be
27   fairly represented."  *Apple v. LJ International, Inc.*, 2008 U.S. Dist. LEXIS 12618 * __ (C.D. Cal. Feb. 8, 2008).
     Where the "substantive claims depend on individual permutations, the claims of the named plaintiffs who have the
28   same general complaint against the class are not typical."  *Gartin v. S&M Nutec LLC*, 245 F.R.D. 429(C.D. Cal.
     2007) (emphasis added).

- 17 -

economic loss while others in the class have not.  Segura may desire to proceed under section 897 as opposed to section 896 and seek different repairs and damages than others in the class.[14]

As a result, Plaintiff fails to satisfy the requirements of Rule 23(a)(2) and (a)(3) and class certification should be denied.

## D.     Plaintiff's Amended Class Certification Attempt Fails Under the Remaining Rule 23 Requirements

### 1.     Adequacy of Representation

Rule 23(a)(4) requires a determination that the proposed class representatives and their counsel not have interests conflicting with other class members and will prosecute the action vigorously on behalf of the absent class members.  *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 412 (9th Cir. 1978)  Atypicality (such as that described in the preceding section) prevents adequate representation. *See, e.g., Rodriguez v. Gates*, 2002 U.S. Dist. LEXIS 10654, *30 (C.D. Cal. 2002).

In addition, Segura's procedural maneuvers unambiguously establish the conflict of interest between him and the proposed class members. Segura attempted to institute pre-litigation procedures under RORA, availed himself of the repair options contained therein, and then made an individual decision to pursue a claim through separate litigation.  (*See* Greenfiber Original Memorandum, p. 6; Em. Ex. A, N)  He simply cannot adequately represent members of the proposed class who may want to seek repair without litigation but who would now be forced, if Segura is successful, into immediate litigation.   Similarly, Segura cannot adequately represent class members who have not experienced any injury in fact.  *See, e.g. Krueger v. Wyeth, Inc.*, 2008 U.S. Dist. LEXIS 12236 (S.D. Cal. 2008) (denying certification of class with injured and uninjured class members); *Tidwell v. Thor*

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

---

[14] RORA section 944 limits the amount recoverable to the reasonable value of repairing the violation.

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1   *Industries, Inc.* 2007 U.S. Dist. LEXIS 21819 (S.D. Cal. 2007) (same)[15]

2   ### 2.  Superiority

3   Greenfiber has previously pointed out the superiority of the RORA informal

4   pre-litigation procedures over a complicated class action involving homeowners

5   who have thus far shown no inclination to pursue litigation claims. (*See* Greenfiber

6   Original Memorandum , pp. 19-23)  As recognized by the Court, these

7   homeowners could pursue RORA remedies and claims should they desire.  (Order,

8   p.11)  Plaintiff offers no reason why this is not still so.

9   The superiority of the RORA notice and repair provisions is clearly

10  demonstrated by the procedural and factual history of this case.  RORA provides

11  for the individual control by the homeowner over the claims and process of any

12  dispute: all but 7 of those whose homes were repaired by Pulte elected not to

13  pursue litigation.  As reflected by the demand letters of the individual homeowners

14  (including Segura), there are multiple construction problems associated with their

15  individual homes.  Em. Ex. N.  This class action would force class members to

16  litigate one of their alleged construction problems while other problems might be

17  effectively and quickly repaired, resulting in a piecemeal repair and resolution.

18  ### 3.  Manageability

19  Rule 23(b)(3)(D) requires that the Court consider the "difficulties likely to

20  be encountered in the management of a class action."  A class action cannot be

21  "superior" if each class member has to litigate numerous and substantial separate

22  issues to establish his or her right to recover individually.  *See, e.g., Dalkon Shield,*

23

---

[15] As noted by the Court, the very existence of other litigation involving Segura renders inadequate his representation of the class. Order p. 6. Segura is a member of a proposed class separately pursuing Pulte and QI for insulation and other construction problems, in which it is alleged that sufficient notice had been given to invoke the pre-litigation RORA procedures. Matalas Complaint, ¶ 7, Em. Ex. B.  He has also filed his own individual lawsuit against Pulte for insulation and other construction issues that he may opt to pursue in which he also alleges that he gave notice of the construction problems and complaints with RORA. Kearl Complaint, ¶ 7, Em Ex. A.  Segura has now authorized the dismissal of his individual case. Parks Decl. Ex. S.  There has been no move to dismiss and his authorization is only for dismissal without prejudice, providing Segura with the opportunity to waltz back into such individual case should he desire.  *Id.*  Given his opportunistic use of the litigation and RORA process to serve his own goals, such a dance is not an idle prospect!

1 || 693 F.2d at 856; *Valentino*, 97 F.3d at 1234-35.

2 ||     Among other numerous and substantial individual issues that would

3 || necessitate individual determinations are the following:  (1) pursuant to the section

4 || 936 negligence standard  applicable to non-builders for violations of section 896,

5 || separate and complicated trials may be required for each individual class member;

6 || (2) separate and complicated <u>causation</u> determinations may need to be made for

7 || each class member; and (3) separate and complicated determinations may need to

8 || be made for each individual class member regarding Greenfiber's affirmative

9 || section 945.5 and applicable common law defenses.  RORA provides for different

10 || standards of conduct applicable to Pulte, Greenfiber, and QI (section 936) and the

11 || procedural history of this and the other related cases evidence multiple repair

12 || issues presented with homeowners involved in multiple lawsuits.

13 ||     Plaintiff has also provided no explanation as to how he would deal with the

14 || RORA pre-litigation notice obligation and repair opportunities other than to simply

15 || by-pass them for all the unnamed members of the proposed class.  RORA

16 || unquestionably provides every homeowner with the opportunity to invoke the

17 || RORA pre-litigation process and participate in that process, including the use of

18 || alternatives such as having the matter referred to mediation.  *See* RORA sections

19 || 919, 928. Does Plaintiff propose to deprive potential class members of their

20 || individual choices regarding repair?  If not, then the interplay between the class

21 || action lawsuit and the notice and repair obligations create an infinite number of

22 || administrative and manageability problems.

23 ||     Plaintiff also argues that pre-litigation notice has been waived simply

24 || because Defendant Pulte has general notice of the alleged problems with CWBCI.

25 || (Plaintiff's Amended Memorandum, p. 17)  Neither the statute, nor any applicable

26 || case law, provides that the pre-litigation procedures can be jettisoned when the

27 || builder has general knowledge of the alleged RORA violation.

28 || ///

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**
**2:08-CV-00151-AHM-JTL**

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1    Plaintiff asserts that he and his class are not obligated to comply with these

2 statutory obligations by virtue of section 931 which provides that pre-litigation

3 notice is not required in the very limited circumstance where the class action

4 claims "address solely the incorporation of a defective component." Plaintiff's

5 Amended Complaint includes claims for RORA violation, negligence, strict

6 product liability, and UCL violations. The allegations of the Amended Complaint

7 are not limited "solely to the incorporation of a defective product."[16]

8    RORA's legislative history makes clear that one of the essential purposes of

9 RORA is to provide builders the opportunity to fix homes without litigation – and

10 to provide homeowners the ability to seek repair without litigation. RORA section

11 931 contemplates no pre-litigation notice and accompanying repair in a case which

12 does not involve the builder (who is in the best position to effectuate a repair) and

13 where the repair effort of the builder would not likely fix the problem. Plaintiff

14 has chosen, however, to sue the builder, Pulte, as well as Greenfiber and QI. As a

15 result, the pre-litigation procedures remain applicable and Pulte should have had

16 the opportunity to exercise the pre-litigation repair option.

17    Finally, by arguing waiver and exemption from the statutory obligations,

18 Segura once again proves he is not a fair or adequate representative: he attempted

19 to give RORA pre-litigation notice and is apparently attempting to receive the

20 benefit of the very pre-litigation procedures that he now seeks to eliminate for all

21 other Pulte homeowners who might be a member of his proposed class.

22    **E.    Plaintiff's UCL Claim Fails**

23    The Court previously rejected Plaintiff's attempt to certify a UCL class,

24 citing the inadequacy of the class definition and uncertainty over whether there

25 was a remedy available to class members under the UCL (Order, p.5, fn. 6), as well

26 as the lack of any common question or typicality as to the alleged

27

28

---

[16] As the *Matalas* and *Kearl* lawsuits and the homeowners' demand letters indicate, the alleged CWBCI problem is only one of many construction issues with their homes. Matalas Complaint, Em. Ex. B, ¶¶ 31, 32; Kearl Complaint, Em. Ex. A, ¶ 9; Em. Ex. N

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

misrepresentations or deceptions.  (*Id*. pp. 6-9)  Plaintiff here merely repeats arguments about UCL claims as if the factual findings and legal conclusions in the Order did not exist, Plaintiff's Amended Memorandum, pp. 20-21, and his re-alleged UCL claim further demonstrates and exacerbates the inadequacies of the initial certification motion.

For example, despite Plaintiff's effort to present RORA as somehow reinforcing the UCL claim (Plaintiff's Amended Memorandum, pp. 20-21), the two statutory schemes are actually incompatible — as illustrated at the outset by the class definition.  Plaintiff's new proposed class definition focuses on current owners of residences built and sold after January 1, 2003 (Amended Complaint, ¶¶35-36; Plaintiff's Notice of Motion for Class Certification, dated May 18, 2009, found at Docket No. 123,  p. 2; Plaintiff's Amended Memorandum, p. 3), in order to avoid inclusion of those "who do not currently live in Pulte homes and would therefore not benefit from an order that Defendants remove and replace insulation." (Order, p.5)  The new definition, however, still includes "current owners of Pulte-built homes who did not purchase their homes from Pulte and thus <u>have no claim</u> to restitutionary relief under California's Unfair Competition Law... (emphasis added)" (*Id*.).

Unlike the RORA, the only monetary form of relief permitted under the UCL is to restore "to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful."  UCL section  17203. "In the context of the UCL, 'restitution' is meant to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest, and is so limited." *In re First Alliance Mortg. Co.*, 471 F.3d 977, 996 (9th Cir. 2006)  Thus, "a plaintiff may recover money or property obtained from the plaintiff or <u>persons represented by the plaintiff</u> through unfair or unlawful business practices (emphasis added)" *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal.4th 163, 173 (2000).

1  Here, Plaintiff wants to have Defendants "disgorge" to the current-owner

2 class what could have been obtained only from a differently defined group – initial

3 purchasers.  (Amended Complaint, ¶¶72, 73, 76 and ¶ 25 ll.17-19; Plaintiff's

4 Amended Memorandum, p.21[17]).  Such non-restitutionary disgorgement was

5 disallowed in *Kraus v. Trinity Mgmt. Servs., Inc.*, 23 Cal.4th 116, 127 (2000)

6 because it would "compel a defendant to surrender all money obtained through an

7 unfair practice even though not all is to be restored to the persons from whom it

8 was obtained or those claiming under those persons."  *See also Feitelberg v. Credit*

9 *Suisse First Boston, LLC*, 134 Cal. App. 4th 97, 1021(2005) (UCL does not permit

10 the award of non-restitutionary disgorgement to a class).

11  Plaintiff is also simply wrong in his tacit assumption that a UCL claim may

12 be based on a claimed RORA construction defect.  Although the "unlawful" prong

13 of the UCL generally includes "anything that can properly be called a business

14 practice which at the same time is forbidden by law," *First Alliance*, 471 F.3d at

15 995 (internal quotation marks omitted), a UCL claim may not be "stacked" on top

16 of another statute that provides an exclusive remedy. If there is a construction

17 defect alleged, then that claim is covered by RORA and no other cause of action is

18 allowed.  RORA section 943(a).  Furthermore, even without an express statutory

19 provision for exclusivity, the incompatibility between RORA and UCL remedies

20 demonstrated by this suit suggests that a Court should decline to apply the UCL's

21 equitable remedies.  *See Feitelberg*, 134 Cal. App. 4th at 1009, 1021 ("'judicial

22 intervention' in a UCL case may be withheld under the equitable doctrine of

23 abstention").

24  Plaintiff's UCL claim also presents its own commonality and typicality

25 problems. With respect to any claimed misrepresentation, this Court previously

26 found that there was no common question because "Plaintiffs would have to show

27

28

---

[17] Rather than disgorgement, Plaintiff actually is seeking damages. Compensation for the costs of replacement and removal are what Plaintiffs repeatedly claim as their "predominant remedy" under RORA.  Plaintiff's Amended Memorandum, pp. 18-20

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1   that the representations each Defendant <u>made to members of the class were all</u>

2   <u>similar</u>.  Plaintiff has not demonstrated that there is any prospect that he will be

3   able to make such a showing (emphasis added)" (Order, p.6)  Furthermore, there

4   was no evidence that Segura's experience was typical of the putative class.  (*Id*. at

5   p. 9)  Plaintiff has still not made a showing at all that any alleged

6   misrepresentation, advertising, or warranty was made to Segura or any other

7   putative class member — let alone that a similar statement was made to all

8   members of the proposed class. These deficiencies have not been corrected in

9   Plaintiff's amended attempt.

10         Furthermore, Plaintiff cannot escape the UCL standing requirement of

11   connecting an "injury in fact" to the alleged "unfair competition" by attempting to

12   assert a RORA claim.  UCL section 17204.  "[T]here must be some connection

13   between the injury and the defendant's conduct" and Segura must show actual

14   reliance to establish any UCL misrepresentation claim. *In Re Tobacco II Cases,*

15   S147345 (Cal. May 18, 2009), slip op. at 28-29.  The record evidence actually

16   contradicts any possible claim of reliance by Segura; he does not recall any pre-

17   sale representations or advertising material about CWBCI or mold.  (Segura Depo.

18   at 135-36).

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**
**2:08-CV-00151-AHM-JTL**

IV.     **CONCLUSION**

For the reasons set forth herein, Greenfiber requests that Plaintiff's Amended Class Certification Motion be denied.

KLINEDINST PC

DATED: June 1, 2009          By:  /s/John D. Klinedinst, Esq.
                                   John D. Klinedinst
                                   Robert L. Clarkson
                                   Robert J. Hatem
                                   Mark J. Goldsmith

                                   **Attorneys for Defendant**
                                   **U.S. GREENFIBER, LLC**

FROST BROWN TODD LLC

DATED: June 1, 2009          By:  /s/Stephen E. Embry, Esq.
                                   Stephen E. Embry,
                                   Christopher S. Burnside

                                   **Pro Hac Vice Counsel**
                                   **Defendant U.S. GREENFIBER,**
                                   **LLC**

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................... 1

II.  RELEVANT AND RESTATED BACKGROUND FACTS .......................... 1

    A.   The Insulation Product ............................................................... 2

    B.   Building Science ........................................................................ 2

    C.   The Dwellings ........................................................................... 4

    D.   Related Litigation ...................................................................... 5

    E.   The Property Owners ................................................................. 6

         1.   Emilio Segura ................................................................... 6

         2.   William Kearl ................................................................... 7

         3.   Diane Matalas ................................................................... 7

         4.   Other *Kearl* Plaintiffs ..................................................... 7

III. ARGUMENT .............................................................................................. 8

    A.   RORA is a Repair Statute .......................................................... 8

         1.   Legislative Purpose .......................................................... 8

         2.   RORA does not create absolute liability or absolutely
              eliminate the economic loss rule for claimed product
              defects. ........................................................................... 10

    B.   Plaintiff Has Not Properly Established Any RORA Violation ........... 12

         1.   Section 896(a)(10) .......................................................... 13

         2.   Section 896(a)(11) .......................................................... 14

         3.   Section 896(g)(3) ............................................................ 15

         4.   Section 896(g)(15) .......................................................... 16

    C.   The Claimed Violations and Greenfiber's RORA Defenses
         Present Numerous Individual Issues ........................................... 16

    D.   Plaintiff's Amended Class Certification Attempt Fails Under
         the Remaining Rule 23 Requirements ......................................... 18

         1.   Adequacy of Representation .............................................. 18

         2.   Superiority ...................................................................... 19

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1          3.      Manageability ........................................................................ 19

2       E.     Plaintiff's UCL Claim Fails ............................................................. 21

3    IV.   CONCLUSION ............................................................................................. 25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

**TABLE OF CONTENTS**
**2:08-CV-00151-AHM-JTL**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apple v. LJ International, Inc.*,
  2008 U.S. Dist. LEXIS 12618 * __ (C.D. Cal. Feb. 8, 2008)..............................17

*Cortez v. Purolator Air Filtration Prods. Co.*,
  23 Cal.4th 163, 173 (2000) ..............................................................................22

*Feitelberg v. Credit Suisse First Boston, LLC*,
  134 Cal. App. 4th 97, 1021(2005) ....................................................................23

*Gartin v. S&M Nutec LLC*,
  245 F.R.D. 429(C.D. Cal. 2007) .......................................................................17

*Greystone Homes, Inc. v. Midtec*, Inc.,
  168 Cal. App. 4th 1194, 1227 (2008)........................................................9, 11, 12

*In re Dalkon Shield*,
  693 F.2d at 856...................................................................................................20

*In re First Alliance Mortg. Co.*,
  471 F.3d 977, 996 (9th Cir. 2006)................................................................22, 23

*In Re Tobacco II Cases*,
  S147345 (Cal. May 18, 2009), slip op. at 28-29 ................................................24

*Kraus v. Trinity Mgmt. Servs., Inc.*,
  23 Cal.4th 116, 127 (2000) ...............................................................................23

*Krueger v. Wyeth, Inc.*,
  2008 U.S. Dist. LEXIS 12236 (S.D. Cal. 2008) ...............................................18

*Lerwill v. Inflight Motion Pictures, Inc.*,
  582 F.2d 507, 412 (9th Cir. 1978)......................................................................18

*Rodriguez v. Gates*,
  2002 U.S. Dist. LEXIS 10654, *30 (C.D. Cal. 2002).......................................18

*Tidwell v. Thor Industries, Inc.*
  2007 U.S. Dist. LEXIS 21819 (S.D. Cal. 2007) ...............................................19

*Valentino v. Carter-Wallace, Inc.*
  97 F.3d 1227, 1233 (9th Cir. 1996).............................................................13, 20

*///*

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1

**Statutes**

2   California Civil Code section 895 ........................................................................... 1

3   California Civil Code section 896 ..............................................10, 11, 12, 13, 17, 20

4   California Civil Code section 896 (g)(3) ............................................................... 16

5   California Civil Code section 896 (g)(3)(E) .......................................................... 16

6   California Civil Code section 896(a)(10) .............................................................. 13

7   California Civil Code section 896(a)(11) .............................................................. 14

8   California Civil Code section 896(g)(15) .............................................................. 16

9   California Civil Code section 896(g)(3) ................................................................ 15

10  California Civil Code section 896(g)(3)(C) ........................................................... 15

11  California Civil Code section 897 ..............................................11, 12, 13, 17, 18

12  California Civil Code section 910 ........................................................................ 5, 8

13  California Civil Code section 919 ......................................................................... 20

14  California Civil Code section 928 ......................................................................... 20

15  California Civil Code section 931 ......................................................................... 21

16  California Civil Code section 936 .................................................................. 11, 20

17  California Civil Code section 942 ............................................................... 9, 10, 12

18  California Civil Code section 943(a) ..................................................................... 23

19  California Civil Code section 944 ......................................................................... 18

20  California Civil Code section 945.5 ................................................................ 10, 20

21  California Civil Code section 945.5a .................................................................... 10

22  California Civil Code section 945.5b .................................................................... 10

23  California Civil Code section 945.5c .................................................................... 10

24  California Civil Code section 945.5d .................................................................... 10

25  California Civil Code section 945.5g .................................................................... 10

26

27

28   *///*

**TABLE OF AUTHORITIES**
**2:08-CV-00151-AHM-JTL**

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA 90017

1

**Other Authorities**

2

California Business Profession Code section  17203 ..............................................22

3

California Business Profession Code section 17200 ...............................5, 21, 22, 23

4

5

California Right to Repair Act (RORA)...1, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24

6

**Rules**

7

FRCP Rule 23 ......................................................................................................18

8

FRCP Rule 23(a)(2) .............................................................................................18

9

FRCP Rule 23(a)(3) .............................................................................................18

10

FRCP Rule 23(a)(4) .............................................................................................18

11

FRCP Rule 23(b)(3)(D) .......................................................................................19

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KLINEDINST PC
777 S. FIGUEROA ST., 47TH FLOOR
LOS ANGELES, CALIFORNIA  90017

**TABLE OF AUTHORITIES**
**2:08-CV-00151-AHM-JTL**